# Exhibit E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| LOCAL UNION 30, UNITED UNION<br>OF ROOFERS, WATERPROOFERS AND<br>ALLIED WORKERS, et al. | : <br> : <br> : <br> :     CIVIL ACTION |
|      Plaintiffs/Counterclaim Defendants, | : |
| v. | :     No. 01-5344 |
| D.A. NOLT, INC., | : |
|      Defendant/Third Party Plaintiff,<br>v. | : |
| ROOFING CONTRACTORS ASSOCIATION | : |
|      Third Party Defendant. | : |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                   **JULY 29, 2008**

Presently before the Court are three Motions for Summary Judgment. For the reasons set forth below, the Motion of Local Union 30, United Union of Roofers, Waterproofers and Allied Workers, et al. ("Local 30") and the Motion of Roofing Contractors Association ("RCA") are granted. The Motion of D.A. Nolt ("Nolt") is denied.

## I.    FACTS

Nolt is a corporation that performs commercial roofing work. Local 30 is a labor union. RCA is a multi-employer association of commercial roofing contractors that exists primarily to conduct negotiations for collective bargaining agreements with the Union on behalf of its members. Richard Harvey ("Harvey") is the Executive Director of the RCA. Since 1993, the RCA has entered into numerous collective bargaining agreements with the Union. This is

possible because the RCA is authorized by its members to negotiate with Local 30 on their behalf. Nolt joined the RCA in June 1999. At that time, Nolt signed a Bargaining Agent Authorization ("BAA"), which authorized the RCA to serve as Nolt's bargaining agent with Local 30. Under the terms of the 1999 BAA, Nolt could withdraw from the RCA, but had to do so at least ninety days before the expiration of the existing agreement. Traditionally, the Union and the RCA begin negotiations at a point close in time to the expiration of the contract that is in place at that time. Contracts have historically expired at the end of April or May. The process involves the Union and the RCA first reaching an agreement, after which copies of the agreement are distributed to members of the RCA for their approval.

In June 2000, ten months before the then-current 1997-2001 agreement was due to expire, the Union initiated negotiations with the RCA concerning the terms of the subsequent agreement. All parties agree that the negotiations took place much earlier than they had previously taken place in the past. Present for the negotiations were the RCA's Board of Directors, Local 30's Vice-President Thomas Pedrick, and Local 30's Business Manager Michael McCann. Aside from its Board of Directors, the RCA did not inform its members that it had started negotiating with the Union.[1] Harvey testified in his deposition that the Union had asked him to keep the negotiations confidential because it did not want the terms of the new agreement to be made known to Union employees. (Nolt Mot. Summ. J. Ex. 3, Harvey Dep. 29: 7-20.) In an effort to keep the employees from learning of the new agreement, the RCA and Local 30 agreed not to reveal the fact that they had started negotiations. (Id. at 36: 12-24.)

---

[1]This is significant because under N.L.R.B. precedent, an employer may not withdraw from a bargaining association after the start of negotiations unless there have been "unusual circumstances" or "mutual consent." See Retail Associates, Inc. 120 N.L.R.B. 388, 395 (1958).

2

Local 30 and the RCA reached a tentative agreement in early July.  On July 5, 2000,

Harvey faxed a Ballot and Memorandum of the agreement to the RCA's Board of Directors for

approval.  Following approval by the RCA's Board of Directors, Harvey then faxed the Ballot

and Memorandum, accompanied by an explanatory cover letter, to the remaining members of the

RCA, including Nolt.  The cover letter instructed the employers to vote on the proposed

collective bargaining agreement within two days.  (Local 30's Mot. Summ. J., Ex. 5.)  The Ballot

presented the following three options: (1) accept the agreement; (2) reject the agreement; or (3)

choose to withdraw from the RCA.  (Id.)  With respect to the option to withdraw, the cover letter

contained the following instructions:

> Please use the attached ballot form to record your firm's vote to
> accept or reject the terms of this tentative agreement.  Members
> who wish to exercise their right to withdraw their bargaining agent
> authorization from the Association for the collective bargaining
> agreement that will become effective May 1, 2001 **must** do so at
> this time and should **not** vote to accept or reject the tentative
> agreement, but rather should use the ballot form to provide written
> notice to the Association of their decision to resign from
> Association membership.  Please note that should your firm decide
> to exercise its right to withdraw from the Association at this time,
> the company will continue to be bound by the current labor
> agreement which expires at midnight on April 30, 2001.

(Id.)  Nolt testified in his deposition that he was confused by this instruction because the

following provision, which is the language used in the BAA, also appeared on the same page of

the cover letter:

> This authorization may only be revoked by written notice from the
> undersigned to the Association not less than ninety (90) days prior
> to the expiration of the current labor agreement between the
> Association and the Union.  Upon the giving of such notice to the
> Association, this authorization will terminate for all purposes.

3

(Id.) Nevertheless, the RCA's members, Nolt included, voted unanimously to accept the terms of the proposed agreement, and Local 30 approved the contract a short time later.

On January 30, 2001, after voting to accept the agreement in July, Nolt sent a letter to the RCA stating that he was exercising his right to withdraw from the RCA. Since this had been the procedure for withdrawal under the terms of the 1999 BAA, Nolt asserted that this was proper notice of withdrawal. Consequently, he believed that he was not bound by the new 2001-2009 agreement. On May 2, 2001, Local 30 filed an unfair labor charge against Nolt before the National Labor Relations Board ("NLRB"), seeking to enforce the terms of the 2001-2009 collective bargaining agreement. On October 22, 2001, Local 30 also filed a Complaint in this Court under the ERISA statute seeking contributions due under the terms of the 2001-2009 agreement. On December 13, 2001, Nolt filed an Answer to the Local's Complaint, and additionally, filed a Counterclaim against Local 30 and a Third-Party Complaint against the RCA, alleging claims for fraud against both parties.

On January 23, 2002, a hearing was held before an ALJ on the unfair labor charges that Local 30 had filed before the NLRB. The ALJ found for Nolt and determined that Nolt was not bound by the terms of the 2001-2009 agreement. Local 30 appealed the ALJ's decision to the NLRB. On December 15, 2003, a three-member panel of the NLRB overturned the ALJ's decision and found that Nolt was bound to the terms of the 2001-2009 collective bargaining agreement. Nolt appealed the Board's decision to the United States Court of Appeals for the Third Circuit. On May 4, 2005, the Third Circuit overturned the Board's decision and issued an opinion in favor of Nolt, finding that Nolt was not bound by the terms of the agreement. The

4

Third Circuit decision disposed of the ERISA claims asserted in the Union's original Complaint

against Nolt.  As such, the only remaining causes of action are Nolt's Counterclaim against Local

30 and the Third-Party Complaint against the RCA.

Nolt filed a Motion for Summary Judgment on both claims.  Local 30 and the RCA have

filed Motions for Summary Judgment on their respective claims.  In its Motion, Nolt argues that

Local 30 and the RCA committed fraud as a matter of law.  It asserts that the decision of the

Third Circuit establishes all of the facts necessary to its fraud claim under a theory of *res*

*judicata*.  Nolt seeks damages for attorney's fees and costs in the amount of $198,004.36.  Both

the RCA and Local 30 contend that summary judgment should be granted in their favor because

Nolt has failed to establish the elements of common law fraud under Pennsylvania law.  The

Court addresses each of the parties' Motions below.

**II.     STANDARD OF REVIEW**

"Summary judgment is appropriate when, after considering the evidence in the light most

favorable to the nonmoving party, no genuine issue of material fact remains in dispute and 'the

moving party is entitled to judgment as a matter of law.'"  Fed. R. Civ. P. 56(c); Hines v. Consol.

Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991) (citations omitted).  The inquiry is "whether the

evidence presents a sufficient disagreement to require submission to the jury or whether it is so

one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 251-52 (1986).  The moving party carries the initial burden of demonstrating the

absence of any genuine issues of material fact.  Big Apple BMW, Inc. v. BMW of N. Am. Inc.,

974 F.2d 1358, 1362 (3d Cir. 1992).  "A fact is material if it could affect the outcome of the suit

after applying the substantive law.  Further, a dispute over a material fact must be 'genuine,' i.e.,

the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998), aff'd, 172 F.3d 40 (3d Cir. 1998) (citations omitted).

Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that demonstrates that there is a genuine issue of fact requiring a trial. See Big Apple BMW, 974 F.2d at 1362-63. Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[A]n opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

## III.    DISCUSSION

### A. Nolt's Motion for Summary Judgment

Nolt argues that there are no material factual disputes in this matter, and therefore, it is entitled to summary judgment on its claims against both the RCA and Local 30 as a matter of law. This case does not present any material factual disputes. Therefore, the Court must only address whether Nolt has established his claim for fraud as a matter of law. "Generally, state law governs the necessary elements of fraud that must be identified in the complaint and proven at trial." Long v. Admin. of Montgomery Hosp. of Norristown, No. 00-1056, 2000 WL 1593980, at *3 (E.D. Pa. Oct. 25, 2000). For a successful fraud claim, Pennsylvania law requires that a Plaintiff prove:

(1) a representation;
(2) which is material to the transaction at hand;
(3) made falsely, with knowledge of its falsity or recklessness as to
whether it is true or false;
(4) with the intent of misleading another into relying on it;
(5) justifiable reliance on the misrepresentation; and
(6) the resulting injury was proximately caused by the reliance.

Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994).  Under Pennsylvania law, a Plaintiff must prove

each element of fraud by clear and convincing evidence.  Mellon Bank Corp. v. First Union, 951

F.2d 1399, 1409 (3d Cir. 1991).  Assuming, arguendo, that Nolt has established elements 1,2,3

and 5, this Court need only address the elements of intent and damages.

### 1. Intent

#### a. RCA

Nolt identifies three misrepresentations in its claim against the RCA.  First, Nolt alleges

that the RCA's failure to disclose the start of negotiations with Local 30 constitutes a fraudulent

misrepresentation.  Second, Nolt claims that the RCA made a fraudulent misrepresentation when

it presented its Ballot and Memorandum to its employers, stating that the RCA's Board of

Directors endorsed ratification of the agreement because he contends the agreement had already

been ratified by a majority of the Board at that point.  Third, Nolt argues that the RCA made a

fraudulent misrepresentation through the cover letter accompanying the Ballot and Memorandum

because it contained an ambiguity with regard to the time-period in which an employer could

withdraw from the RCA.

Nolt has presented no evidence demonstrating that the RCA intended to defraud Nolt

with regard to any of the representations referenced above.  Nolt argues that the RCA's failure to

7

disclose the start of negotiations constitutes fraud because under NLRB precedent, an employer

may only withdraw from a bargaining association after the start of negotiations where there have

been "unusual circumstances" or "mutual consent." See Retail Associates, Inc., 120 N.L.R.B.

388, 395 (1958). Thus, Nolt alleges that the RCA's failure to inform its members that

negotiations had started is evidence that the RCA intended to defraud Nolt into being bound by

the new agreement. However, the mere fact that the RCA did not make public the start of their

negotiations does not, in and of itself, establish that it intended to defraud Nolt. In order to set

forth a claim for fraud, Nolt must establish that the RCA intended to mislead it into being bound

by the 2001 collective bargaining agreement. See Gruenwald v. Advanced Computer

Applications, Inc., 730 A.2d 1004, 1014 (Pa. Super. Ct. 1999). Mr. Harvey testified in his

deposition that the negotiations were kept confidential to prevent discord among Union

employees. (Nolt Mot. Summ. J. Ex. 3, Harvey Dep. 29: 7-20; 36: 12-24.) Nolt has presented no

evidence to support its position that the negotiations were actually conducted in secret to mislead

it into being bound by the agreement. Furthermore, the Ballot gave Nolt the option of

withdrawing from the agreement. This cannot establish that the RCA intended to strip Nolt of

the opportunity not to be bound by the terms of the agreement. Had Nolt chosen to withdraw

from the RCA, instead of voting to accept the agreement, he would have been free from any

obligation under the 2001 agreement. (Id. at 91: 10-16.) Thus, while Nolt may have been

confused by the language of the cover letter, the evidence presented as to this representation does

not establish that the RCA intended a fraud upon Nolt.

   Nolt next asserts that the Ballot and election were, in essence, a "sham" because the new

agreement had already been ratified by a majority of the Board at the time it was distributed to

the RCA's members. However, the fact that a majority of the Board voted in favor of the agreement is not evidence of fraud on the part of the RCA. The cover letter accompanying the Ballot stated that the "Association's Board of Directors has unanimously endorsed ratification of the proposed amendments by all member firms." (Local 30's Mot. Summ. J., Ex. 5.) Thus, the letter served to inform the RCA's members that the Board had unanimously voted in favor of the agreement. The fact that the members of the Board received their Ballots before other members of the RCA does not render the election a "sham," as Nolt alleges. While the Board members all voted in favor of the agreement, the fact remains that they had to vote before the contract was ratified. Later, the Ballots were sent to the remaining members of the RCA, all of whom, including Nolt, also voted in favor of the agreement. The fact that a majority had already voted by the time Nolt received his Ballot does not change the fact that, at the end of the day, the entire membership voted in favor of the agreement. Thus, the agreement was only accepted after a majority of the members voted for it. If Nolt was not in favor of the agreement, he could have elected to withdraw from the RCA. While each member may not have received the Ballot simultaneously, each member was still entitled to its vote. Nolt has presented no evidence that the election was a "sham."

Nolt has similarly failed to establish that the RCA intended to mislead it by intentionally distributing an ambiguous Ballot and Memorandum. The cover letter accompanying the Ballot and Memorandum stated that an employer may withdraw from the BAA by written notice not less than ninety days from the expiration of the prior agreement. (Id.) The third option on the Ballot, the option to withdraw, stated that an employer who did not wish to be bound by the agreement should elect to withdraw at that time. (Id.) The Ballot articulated its members' rights

9

under the BAA, and then provided the chance to withdraw. The RCA never tried to deny Nolt

the right to withdraw, which is what Nolt contends. While Nolt testified that he was confused by

the two provisions in the Ballot and cover letter, it has failed to present evidence demonstrating

that the provisions were intentionally ambiguous. Harvey testified that the RCA included the

option to withdraw on the Ballot because it was seeking to ratify the subsequent agreement more

than ninety days before the expiration of the current contract, and recognized that this was an

unorthodox approach. (Nolt Mot. Summ. J. Ex. 3, Harvey Dep. 83: 16-24.) As it has presented

no evidence that the ambiguity was, in any way, intentional, Nolt has not met its burden of

establishing that this misrepresentation was fraudulent.

### b. Local 30

Because Nolt has failed to establish the element of intent with regard to any of the

misrepresentations that it alleges, summary judgment must be granted in favor of Local 30. Nolt

asserts that Local 30 is liable for fraud because the secret negotiations with the RCA constitute a

material misrepresentation on its part, and because it filed suit against Nolt before the NLRB and

in this Court following Nolt's attempt to withdraw from the 2001 agreement. Initially, the Court

notes that silence alone does not amount to fraud in the absence of some duty to speak.

Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 611-12 (3d Cir. 1995) (citing

Smith v. Renaut, 564 A.2d 188, 192 (Pa. Super. Ct. 1989)). "Absent a confidential or fiduciary

relationship between the parties, such a duty to speak normally does not arise." Daniel Boone

Area Sch. Dist. v. Lehman Bros., 187 F. Supp. 2d 400, 408 (W.D. Pa. 2002). Here, Local 30 had

no duty to inform Nolt that it had begun negotiations with the RCA. The RCA represented Nolt

in its negotiations with the Union. Local 30 was, therefore, on the other side of the negotiating

table. Under such circumstances, it cannot be said that Local 30 had a duty to inform members of the opposing party that it had started to negotiate.

However, even if Local 30 had had a duty to inform Nolt as to the start of negotiations, as noted above, Nolt has failed to establish that the negotiations were conducted in secret in an effort to defraud it into being bound by the agreement. Both the RCA and Local 30 contend that the negotiations were kept confidential to prevent the members of the Union from learning of the new agreement prior to the ratification vote. (Id. at 29: 7-20.) Nolt has presented no evidence to support its position that the discussions were conducted secretly in an attempt to defraud. In addition, Nolt's assertion that Local 30's filing of charges before the NLRB and before this Court constitutes fraud is equally without merit. The long and complicated procedural history of this case, coupled with the fact that a three-member panel of the NLRB found for Local 30 (even though later reversed by the Third Circuit), demonstrates that there was a legitimate controversy between the parties, and that the Complaints were, in no way, frivolous. As such, the Court finds that Nolt has failed to present sufficient evidence to establish a claim for common law fraud against Local 30.

### 2. Preclusive Effect of Third Circuit Decision

While this Court finds that Nolt cannot establish intent, Nolt believes that all of the elements of fraud were established by the Third Circuit's decision in N.L.R.B. v. D.A. Nolt. Based on that decision, Nolt argues that the RCA and Local 30 are liable for fraud under the doctrine of collateral estoppel. Under Pennsylvania law, collateral estoppel applies where the party asserting it has shown that:

> (1) an issue decided in a prior action is identical to the issue presented in a later one;

11

(2)     the prior action resulted in a final judgment on the merits;

(3)     the party against whom collateral estoppel is
asserted must be a party to the prior action, or in
privity with a party to the action; and

(4)     the party against whom collateral estoppel is asserted had a
full and fair opportunity to litigate the issue in the prior
action.

Jones v. United Parcel Serv., 214 F.3d 402, 405-06 (3d Cir. 2000). The party asserting collateral

estoppel bears the burden of establishing each element. Suppan v. Dadonna, 203 F.3d 228, 233

(3d Cir. 2000). Because the Court finds that Nolt has failed to demonstrate that the issue decided

before the Third Circuit is identical to that to be decided before this Court, collateral estoppel

does not apply, and Nolt has failed to establish the elements of its fraud claims.

      Unlike the case before this Court, the case before the Third Circuit took place within the

legal framework of the National Labor Relations Act. See N.L.R.B. v. D.A. Nolt, Inc., 406 F.3d

200 (3d Cir. 2005). While the question before this Court is whether the RCA and Local 30 are

liable to Nolt for fraud, the question before the Third Circuit was whether "unusual

circumstances" existed to justify Nolt's withdrawal from the 2001 collective bargaining

agreement. Id. at 202. The Third Circuit considered whether the Board's finding that Nolt was

bound to the terms of the 2001 agreement was rational in light of the standard set forth by a line

of NLRB cases dealing with the issue of employer withdrawal. See Chel LaCort, 315 N.L.R.B.

1036 (1994); Retail Associates, Inc., 120 N.L.R.B. 388 (1958). The Retail Associates decision

established the circumstances under which an employer would be justified in withdrawing from a

multi-employer bargaining unit after negotiations had begun. 120 N.L.R.B. at 395. Under the

Retail Associates rule, an employer may only withdraw from the bargaining association after the

12

start of negotiations when "unusual circumstances" exist to justify the withdrawal, or where there

is "mutual consent." Id. In Chel LaCort, the Board explained that an association's failure to

inform its members of the start of negotiations does not constitute "unusual circumstances," and

therefore, does not permit an employer to withdraw after the start of negotiations. 315 N.L.R.B.

at 1036. However, the Board noted that it refused to extend the "unusual circumstances"

exception in that case because there was no evidence of "collusion or conspiracy." Id. at 1036 n.

5. Thus, the Board suggested that where "collusion or conspiracy" was present, an association's

failure to inform its members of the start of negotiations, may constitute "unusual circumstances"

justifying withdrawal from the association after negotiations have begun. Id.; see also D.A. Nolt,

406 F.3d at 204-06.

Operating under this framework, the Third Circuit found that the actions of the RCA and

the Union, in conducting the negotiations in secret, constituted "collusion or conspiracy" under

Chel LaCort. Id. As such, the Third Circuit determined that these "unusual circumstances"

justified Nolt's withdrawal from the RCA after it began negotiating with the Union. D.A Nolt,

406 F.3d at 204. The Third Circuit defined the "conspiracy" as "the agreement to negotiate in

secret." Id. at 205. The "collusion" was the "actual participation in the secret meetings." Id.

Nolt argues that because the Third Circuit found that the RCA and Local 30 "conspired" or

"colluded" against it within the framework of the National Labor Relations Act, that they are

necessarily liable for fraud. Noticeably however, nothing in the Third Circuit's decision required

the Court to decide the issue of intent to defraud. In fact, the Third Circuit explicitly noted that

"[i]n accordance with the purpose of the Act, it is not necessary to show that the parties actually

agreed to an illegal plan to harm a specific person to prove 'conspiracy' or that they specifically

13

intended to defraud a person of his rights to prove 'collusion.'" Id. at 205. Thus, the Third Circuit made no finding as to whether the RCA and Local 30 intended to defraud Nolt .

The element of intent is a crucial element that must be proven for a successful fraud claim under Pennsylvania law. Gibbs, 647 A.2d at 889. Therefore, in deciding Nolt's fraud claims, this Court necessarily must consider the issue of intent to defraud, as an essential element of Nolt's claims. The Third Circuit, however, explicitly stated that it made no finding whatsoever on the issue of intent. Thus, the issues before the two Courts are not the same. As such, Nolt's assertion that the decision of the Third Circuit conclusively establishes fraud on the part of the RCA and Local 30 is without merit.

### 3. Damages

Regarding the final element of Nolt's fraud claim, damages, the company asserts that the Third Circuit's decision establishes that it is entitled to an award of attorney's fees and costs that it incurred in the Board action. Nolt argues that the Third Circuit found that it was proximately harmed by the "conspiracy" and "collusion" of Local 30 and the RCA, and therefore, that decision established that it is entitled to attorney's fees. (Nolt Mot. Summ. J. 24-25.) However, the Third Circuit determined that the harm to Nolt was the deprivation of its right to withdraw from the RCA. D.A. Nolt, 406 F.3d at 205. Nolt argues that insofar as its right to withdraw was only restored after incurring attorney's fees to litigate the matter, these fees were part of the harm its suffered at the hands of Local 30 and the RCA. However, the Third Circuit found that the proximate harm to Nolt was the deprivation of the right to withdraw, not the expenses involved in litigating the case. Id. In fact, the Third Circuit ordered that each party would be responsible for its own litigations costs. N.L.R.B. v. D.A. Nolt, Inc., 412 F.3d 477, 478 (3d Cir. 2005).

14

Furthermore, Nolt's case before this Court is one for common law fraud against Local 30 and the RCA. Attorney's fees are not recoverable in an action for common law fraud. See Universal Computer Consulting, Inc. v. Pitcairn Enter., Inc., No. 03-2398, 2005 WL 2077269, at * 16 (E.D. Pa. Aug. 26, 2005) (finding fraud is no exception to proposition that litigants are responsible for their own counsel fees); Degen v. Bunce, No. 93-5674, 1995 WL 120483, at * 8 (E.D. Pa. Mar. 13, 1995) (attorney's fees not recoverable in action for common law fraud). Thus, Nolt has failed to demonstrate recoverable damages on the claims of fraud before this Court. As such, its Motion for Summary Judgment must be denied.

**B.    Summary Judgment Motions of RCA and Local 30**

As stated above, Local 30 and the RCA have demonstrated that no genuine issue of material fact exists with regard to Nolt's fraud claims. The RCA and Local 30 have shown that no evidence of intent has been discovered with regard to either party, and that no recoverable damages have been alleged. Furthermore, the allegations of fraud have not been proven by the decision of the Third Circuit. The Third Circuit decided that the actions of the RCA and Local 30, in conducting secret negotiations, constituted "unusual circumstances" for purposes of the National Labor Relations Act. D.A. Nolt, 406 F.3d at 204-06. The Third Circuit made no finding as to the question of whether the RCA and Local 30 intended to defraud Nolt. Id. at 205. As such, the decision of the Third Circuit does not establish the elements of Nolt's claim under the doctrine of collateral estoppel. In short, the record before this Court simply does not make out the elements of common law fraud. Thus, Nolt's Motion for Summary Judgment is denied. Summary judgment is granted in favor of Local 30 and the RCA.

An appropriate Order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| LOCAL UNION 30, UNITED UNION OF ROOFERS, WATERPROOFERS AND ALLIED WORKERS, et al. | : : : |
| Plaintiffs/Counterclaim Defendants, | : : CIVIL ACTION |
| v. | : : No. 01-5344 |
| D.A. NOLT, INC., | : : |
| Defendant/Third Party Plaintiff, v. | : : : |
| ROOFING CONTRACTORS ASSOCIATION | : : |
| Third Party Defendant. | : : |

### ORDER

**AND NOW**, this    29th    day of July, 2008, in consideration of the Motions for

Summary Judgment filed by each of the above-captioned parties and the responses thereto, it is

hereby **ORDERED** as follows:

(1) The Motion for Summary Judgment filed by Defendant/ Third Party

Plaintiff D.A. Nolt, Inc. (Doc. No. 67) is **DENIED**;

(2) The Motion for Summary Judgment filed by Plaintiff/Counterclaim

Defendant Local Union 30, United Union of Roofers, Waterproofers and

Allied Workers (Doc. No. 65) is **GRANTED**;

(3)     The Motion for Summary Judgment filed by Third Party Defendant

Roofing Contractors Association (Doc. No. 66) is **GRANTED**.


BY THE COURT:


/s/ Robert F. Kelly
ROBERT F. KELLY
SENIOR JUDGE