# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ROOFERS LOCAL NO. 30 COMBINED PENSION FUND; BOARD OF TRUSTEES, ROOFERS LOCAL NO. 30 COMBINED PENSION FUND | : : : : : | |
| and | : : | |
| MICHAEL O'MALLEY, in his fiduciary capacity, | : : | CIVIL ACTION |
| Plaintiffs, | : : : | |
| v. | : : | No. 09-1445 |
| D.A. NOLT, INC., | : : : | |
| Defendant. | : : : | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                          **JUNE 18, 2010**

Presently before the Court are two Motions for Summary Judgment. Plaintiffs Roofers Local No. 30 Combined Pension Fund, and its Board of Trustees and fiduciary Michael O'Malley (collectively, the "Fund") move for summary judgment against Defendant D.A. Nolt ("Nolt") and to dismiss all counterclaims in this action. Nolt filed a Cross-Motion for Summary Judgment against the Fund seeking to enforce a March 5, 2009 Opinion and Award ("Arbitration Decision") and a June 20, 2009 Final Award ("Final Award") of Arbitrator Ira F. Jaffe, Esquire (the "Arbitrator") resulting from arbitration conducted pursuant to 29 U.S.C. § 1401(a), and awarding attorneys fees and costs pursuant to 29 U.S.C. § 1451(e).

## I.  BACKGROUND

This is an appeal by a multiemployer pension fund of the determination made at statutory arbitration that an employer owed no withdrawal liability under the Multiemployer Pension Plan Amendments Act of 1980 (the "MPPAA").  This is the last of three related legal disputes involving the Fund which arose out of the former relationship between Nolt and Local Union 30 ("Local 30").

Nolt is a corporation that performs commercial roofing work.  Local 30 is a labor union. Nolt was also a member of the Roofing Contractors Association (the "RCA"), a multi-employer association of commercial roofing contractors that exists primarily to conduct negotiations for collective bargaining agreements with the Union on behalf of its members.  Since 1993, the RCA has entered into numerous collective bargaining agreements with Local 30.  These were made possible because the RCA was authorized by its members to negotiate with Local 30 on their behalf.  Nolt joined the RCA in June 1999.  At that time, Nolt signed a Bargaining Agent Authorization ("BAA"), which authorized the RCA to serve as Nolt's bargaining agent with Local 30.  Under the terms of the 1999 BAA, Nolt could withdraw from the RCA, but had to do so at least ninety days before the expiration of the existing agreement.

In June 2000, ten months before the 1997-2001 Collective Bargaining Agreement ("CBA") was due to expire, Local 30 initiated negotiations with the RCA concerning the terms of a subsequent agreement.  In July 2000, the RCA and Local 30 concluded negotiations for a successor CBA for the period May 1, 2001 to April 30, 2009, and the union membership ratified the CBA.  On January 30, 2001, Nolt sent a letter to the RCA stating that it was exercising its right to withdraw from the RCA.  Because this had been the procedure for withdrawal under the

terms of the 1999 BAA, Nolt asserted that this was proper notice of withdrawal.  Consequently,

Nolt believed that it was not bound by the new 2001-2009 agreement.

On May 2, 2001, Local 30 filed an unfair labor charge against Nolt before the National

Labor Relations Board ("NLRB"), seeking to enforce the terms of the 2001-2009 CBA.  On

October 22, 2001, Local 30 also filed a Complaint in this Court under the Employee Retirement

Income Security Act of 1974 ("ERISA") seeking contributions due under the terms of the 2001-

2009 agreement.  See Local 30, United Union of Roofers, Waterproofers and Allied Workers v.

D.A. Nolt, Inc., 625 F. Supp. 2d 223 (E.D. Pa. 2008).[1]

On January 23, 2002, a hearing was held before an Administrative Law Judge ("ALJ") on

the unfair labor charges that Local 30 had filed before the NLRB.  The ALJ found for Nolt and

determined that Nolt was not bound by the terms of the 2001-2009 agreement.  Local 30 appealed

the ALJ's decision to the NLRB.  On December 15, 2003, a three-member panel of the NLRB

overturned the ALJ's decision and found that Nolt was bound to the terms of the 2001-2009 CBA.

Nolt appealed the Board's decision to the Court of Appeals for the Third Circuit.  On May 4,

2005, the Third Circuit overturned the Board's decision and issued an opinion in favor of Nolt,

finding that Nolt was not bound by the terms of the agreement.[2]  See NLRB v. D.A. Nolt, Inc.,

_____

[1]On December 13, 2001, Nolt filed a Counterclaim against Local 30 and a Third-Party
Complaint against the RCA, alleging claims for fraud against both parties.  This matter was
placed in civil suspense from February 2005 to April 2007.  The  parties all filed Motions for
Summary Judgment.  On July 29, 2008, we determined that Local 30 and the RCA demonstrated
that no genuine issue of material fact existed with regard to Nolt's fraud claims, and granted their
Motions for Summary Judgment.  Local 30, 625 F. Supp. 2d at 223.

[2]The question before the Third Circuit was whether "unusual circumstances" existed to
justify Nolt's withdrawal from the 2001 CBA.  NLRB, 406 F.3d at 202.  The Third Circuit
considered whether the Board's finding that Nolt was bound to the terms of the 2001 agreement
was rational in light of the standard set forth by a line of NLRB cases dealing with the issue of

406 F.3d 200 (3d Cir. 2005).[3]

The instant action derives from the same factual circumstances as the labor dispute. Nolt

ceased making contributions to the Fund after the prior CBA expired on April 30, 2001. On May

1, 2006, the Fund issued a notification to Nolt that it owed withdrawal liability (the "Withdrawal

Liability Demand"). The Fund advised Nolt that Nolt had made a complete withdrawal from the

Plan during the 2001 Plan year, and that Nolt was liable to pay withdrawal liability as required

under 29 U.S.C. §§ 1382 and 1399(b)(1).[4] (Pls.' Mot. Summ. J., Ex. 49.) The Fund informed

_____

employer withdrawal. See Chel LaCort, 315 N.L.R.B. 1036 (1994); Retail Assoc., Inc., 120
N.L.R.B. 388 (1958). The Retail Associates decision established the circumstances under which
an employer would be justified in withdrawing from a multi-employer bargaining unit after
negotiations had begun. 120 NLRB at 395. Under the Retail Associates rule, an employer may
only withdraw from the bargaining association after the start of negotiations when "unusual
circumstances" exist to justify the withdrawal, or where there is "mutual consent." Id. In Chel
LaCort, the Board explained that an association's failure to inform its members of the start of
negotiations does not constitute "unusual circumstances," and therefore, does not permit an
employer to withdraw after the start of negotiations. 315 N.L.R.B. at 1036. However, the Board
noted that it refused to extend the "unusual circumstances" exception in that case because there
was no evidence of "collusion or conspiracy." Id. at 1036 n.5. Thus, the Board suggested that
where "collusion or conspiracy" was present, an association's failure to inform its members of
the start of negotiations may constitute "unusual circumstances" justifying withdrawal from the
association after negotiations have begun. Id.; see also NLRB, 406 F.3d at 204-06.

    Operating under this framework, the Third Circuit found that the actions of the RCA and
Local 30, in conducting the negotiations in secret, constituted "collusion or conspiracy" under
Chel LaCort. NLRB, 406 F.3d at 204. As such, the Third Circuit determined that these "unusual
circumstances" justified Nolt's withdrawal from the RCA after it began negotiating with the
Union. Id.

    [3]The Third Circuit did enter an amended judgment in June 2005, reinstating the ALJ's
determination that Nolt must recognize Local 30 as the collective bargaining representative for
the bargaining unit and, on request, bargain with Local 30. See NLRB v. D.A. Nolt, Inc., 412
F.3d 477, 478 (3d Cir. 2005). The Arbitrator determined in his decision that the record contains
no evidence that Local 30 ever requested bargaining or that any bargaining actually took place
after the entry of this Amended Judgment. (Arbitration Decision at 6.)

    [4]29 U.S.C. § 1399(b)(1) states:

Nolt that its withdrawal liability, calculated pursuant to 29 U.S.C. § 1391(b), was $370,327, and

demanded nine quarterly payments of $41,024, plus a final payment of $33,339.  (Id.)

As will be discussed, infra, this was not the Fund's first calculation of its withdrawal

liability, but rather, a second revised calculation, and was more than six times greater than the

Fund's prior 2002 calculation of $58,226.  (Id.., Ex. 79.)  The Fund recalculated Nolt's

withdrawal liability after a retroactive adjustment was made by the Fund's actuary that increased

the Plan's 2000 schedule of unfunded vested benefit liabilities ("UVBLs"), or an excess of

nonforfeitable benefits beyond the value of current fund assets, that is, benefits beyond the value

of current fund assets by more than $10 million.[5]  (Id.)  Nolt issued a timely "Request for Review"

of the Fund's Withdrawal Liability Demand on July 17, 2006, pursuant to 29 U.S.C. §

1399(b)(2)(A).  (Id., Ex. 58.)

Nolt issued a demand for arbitration on December 26, 2006, and supplemented on January

7, 2007, challenging the amount of the Fund's withdrawal liability determination.  (Id.)  The

---

(b) Notification, demand for payment, and review upon complete or partial
withdrawal by employer
(1) As soon as practicable after an employer's complete or partial
withdrawal, the plan sponsor shall--
(A) notify the employer of--

(i) the amount of the liability, and

(ii) the schedule for liability payments, and

(B) demand payment in accordance with the schedule.

29 U.S.C. § 1399(b)(1).

[5]An employer's obligation to pay its proportional share of UVBLs is referred to as its
withdrawal liability.

parties agreed to arbitrate under the rules of the American Arbitration Association[6] (Id., Ex. 76.)

The arbitration hearings were held on April 28, 2008 and May 15, 2008, and the Arbitrator issued a 64-page written decision on March 5, 2009 (the "Arbitration Decision"). The Arbitrator rejected each successive change in position that the Fund had taken with respect to Nolt's withdrawal liability. This restored the matter to the Fund's initial determination of Nolt's withdrawal liability of $58,226, which was derived from the calculation of $2.7 million in UVBLs for 2000.[7]

The Arbitrator further found that the Fund had improperly included certain benefits in its calculation of $2.7 million in UVBLs for 2000, and directed the Plan actuary to ascertain the value of those benefits and recalculate the amount of the UVBLs. The Plan actuary determined there was more than $8.5 million in improperly included benefits, and the net result of this

---

[6]As noted earlier, the parties selected Ira Jaffe, Esquire as their single, impartial arbitrator to preside over the arbitration.

[7]The Arbitrator's decision addressed seven issues:

> (1) What the "correct date of the withdrawal" was;
> (2) "[W]hether the Fund used an incorrect withdrawal liability method to calculate the liability in this case";
> (3) "[W]hether the Fund overstated its vested benefit liabilities ('VBLs') by taking into account events not discovered until years after the date of the withdrawal";
> (4) "[W]hether the Fund overstated its VBLs by using actuarial assumptions that were unreasonable in the aggregate";
> (5) "[W]hether the Fund improperly included a number of ancillary and/or forfeitable benefits in the valuation of the vested benefit liabilities";
> (6) "[W]hether the Fund improperly calculated the payment schedule"; and
> (7) "[W]hether the Fund's conduct in this case warrants an award of reasonable attorneys fees and allocation of arbitration costs."

(Arbitration Decision at 2-5.)

correction was that there were no UVBLs for 2000. Accordingly, the Arbitrator determined that Nolt never owed any withdrawal liability.[8]

The Arbitrator entered a Final Award on June 20, 2009. The Fund was directed to refund all of Nolt's payments, with statutory interest.[9] Subsequently, the Fund appealed this decision to this Court.

## II.    STANDARD OF REVIEW

"Summary judgment is appropriate when, after considering the evidence in the light most

---

[8]Specifically, the Arbitrator determined:

> (1) the Fund used an incorrect method in the May 2006 Demand;
> (2) the Fund improperly overstated the UVBLs of the Fund by retroactively increasing those figures for the plan year ending December 31, 2000, and perhaps the prior plan year as well, based upon an error in the data entered into the computer valuation software and/or the programming of that software by the Fund Actuary;
> (3) the Fund improperly included a number of forfeitable benefits in the UVBLs' calculation;
> (4) the Fund improperly calculated the payment schedule by combining the Residential and Commercial hours and using the higher Commercial contribution rate for those combined hours;
> (5) with respect to the payments contained in the March 2008 report, the Fund improperly converted the annual payments to quarterly payments, adding interest to those payments contrary to law; and
> (6) with respect to the payments contained in the March 2008 report, the Fund improperly assessed pre-demand interest for the period of December 31, 2001 through July 1, 2007.

(Arbitration Decision at 63-64.)

[9]The Arbitrator also denied Nolt's request for attorneys fees and costs. The Arbitrator determined that each party was to assume responsibility for its own attorneys fees and costs.

(Arbitration Decision at 64.)

favorable to the nonmoving party, no genuine issue of material fact remains in dispute and 'the moving party is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(c); <u>Hines v. Consol. Rail Corp.</u>, 926 F.2d 262, 267 (3d Cir. 1991) (citations omitted). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-52 (1986). The moving party carries the initial burden of demonstrating the absence of any genuine issues of material fact. <u>Big Apple BMW, Inc. v. BMW of N. Am. Inc.</u>, 974 F.2d 1358, 1362 (3d Cir. 1992). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" <u>Compton v. Nat'l League of Prof'l Baseball Clubs</u>, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998), <u>aff'd</u>, 172 F.3d 40 (3d Cir. 1998) (citations omitted).

Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that demonstrates that there is a genuine issue of fact requiring a trial. <u>See</u> <u>Big Apple BMW</u>, 974 F.2d at 1362-63. Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). "[A]n opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

### III.    OVERVIEW OF THE MPPAA

The MPPAA amended ERISA to provide for "withdrawal liability." When an employer makes a "complete withdrawal" from a multiemployer pension plan, and that plan carries UVBLs or an excess of nonforfeitable benefits beyond the value of current fund assets, the employer may be responsible for its pro rata share of that plan's UVBLs. See 29 U.S.C. §§ 1383, 1391(b) and 1393(c). As noted, an employer's obligation to pay its proportional share of UVBLs is referred to as its withdrawal liability.

Before it was enacted, "many employers were withdrawing from multiemployer plans because they could avoid withdrawal liability if the plan survived for five years after the date of their withdrawal," and Congress was concerned "'that ERISA did not adequately protect multiemployer pension plans from the adverse consequences that result when individual employers terminate their participation or withdraw.'" Supervalu, Inc. v. Bd of Trs. of Sw. Pa. & W. Md. Area Teamsters & Employers Pension Fund, 500 F.3d 334, 336 (3d Cir. 2007) (quoting Warner-Lambert Co. v. United Retail & Wholesale Employee's Local No. 115 Pension Plan, 791 F.2d 283, 284 (3d Cir. 1986)). The MPPAA was therefore enacted and "designed '(1) to protect the interests of participants and beneficiaries in financially distressed multiemployer plans, and (2) to encourage the growth and maintenance of multiemployer plans in order to ensure benefit security to plan participants.'" Bd of Trs. of Trucking Employees of N. Jersey Welfare Fund, Inc. Pension Fund v. Centra Inc., 983 F.2d 495, 504 (3d Cir. 1992); see also Vornado, Inc. v. Trs. of the Retail Store Employees' Union Local 1262, 829 F.2d 416, 420 (3d Cir. 1987) ("[T]he amendments as a whole clearly were meant to facilitate effective plan management and protect the interests of beneficiaries and participants."); Bd of Trs. of Teamsters Local 863 Pension Fund v.

Foodtown, Inc., 296 F.3d 164, 168 (3d Cir. 2002) (explaining that the MPPAA works to "protect the retirement benefits of covered employees"); IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc., 788 F.2d 118, 127 (3d Cir. 1986) ("Courts have indicated that because ERISA (and the MPPAA) are remedial statutes, they should be liberally construed in favor of protecting the participants in employee benefit plans.").

To accomplish these goals, the MPPAA "requires that a withdrawing employer pay its share of the plan's unfunded liability," which "insures that the financial burden will not be shifted to the remaining employers" in the fund. Supervalu, 500 F.3d at 337; see also 29 U.S.C. § 1381(a); Foodtown, 296 F.3d at 168 ("[T]he MPPAA requires employers who withdraw from underfunded multiemployer pension plans to pay a withdrawal liability."). The pension fund "determine[s] whether withdrawal liability has occurred and in what amount." Supervalu, 500 F.3d at 337 (citing 29 U.S.C. §§ 1382, 1391). Under 29 U.S.C. § 1383(a), a "complete withdrawal . . . occurs when an employer- (1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a). "[T]he amount of an employer's withdrawal liability is the employer's proportionate share of the unfunded vested benefits existing at the end of the plan year preceding the plan year in which the employer withdraws." Supervalu, 500 F.3d at 337 (citing 29 U.S.C. § 1391(b)(2)(A)).

In addition, a multiemployer pension plan is vested with the power under the MPPAA to determine when there is a complete withdrawal, to calculate the amount of withdrawal liability and the schedule of payments, and to demand and collect withdrawal liability in accordance with its determination. See 29 U.S.C. §§ 1382 and 1399(b)(1).

## IV.    STANDARD OF REVIEW OF THE ARBITRATION DECISION

It is clear that, in arbitration under the MPPAA, the Arbitrator's factual findings are presumed to be correct and are "rebuttable only by a clear preponderance of the evidence."  29 U.S.C. § 1401(c); Huber v. Casablanca Indus., Inc., 916 F.2d 85, 89-90 (3d Cir. 1990); United Retail & Wholesale Employees v. Yahn & McDonnell, Inc., 787 F.2d 128, 135 n.9 (3d Cir. 1986). The "clear preponderance" language of the statute has been used interchangeably with "clear error." See, e.g., Santa Fe Pac. Corp. v. Cent. States, Se. & Sw. Areas Pension Fund, 22 F.3d 725 (7th Cir. 1994).  "A finding is clearly erroneous if the reviewing court, after duly acknowledging the superior proximity of the factfinder to the witnesses, is firmly convinced that the finding is erroneous."  Santa Fe, 22 F.3d at 727 (citing Concrete Pipe & Prods., Inc. v. Constr. Laborers Pension Trust, 508 U.S. 602 (1993)).

Moreover, reviewing courts must give great deference to an arbitrator's determination because of the MPPAA's strong policy favoring arbitration of withdrawal liability disputes. Mason & Dixon Tank Lines, Inc. v. Central States Pension Fund, 852 F.2d 156, 163-64 (6th Cir. 1988) (stating that arbitration is the "preferred method" for resolving withdrawal liability disputes and that "under the MPPAA 'arbitration reigns supreme'").  In Sherwin-Williams Co. v. N.Y. State Teamsters Conference Pension, Ret. Fund, the court stated that:

> [T]he series of presumptions prescribed by the Multiemployer Act were intended by Congress to "ensure the enforceability of employer liability. In the absence of these presumptions, employers could effectively nullify their obligation by refusing to pay and forcing the plan sponsor to prove every element involved in making an actuarial determination."

158 F.3d 387, 392-93 (6th Cir. 1998); see also Board of Trs., Mich. United Food & Commercial Workers Unions v. Eberhard Foods, Inc., 831 F.2d 1258, 1260 (6th Cir. 1987).

Furthermore, deference to the findings of the arbitrator is proper because the arbitrators chosen to resolve the complicated issue of withdrawal liability often have relevant expertise in the field of pension law which can contribute significantly to the accuracy of a decision. Sherwin-Williams, at 392-93.

The Arbitrator's legal conclusions are reviewed de novo.[10]  Crown Cork & Seal Co. v. Cent. States Se. & Sw. Areas Pension Fund, 982 F.2d 857, 860 (3d Cir. 1992).  In Huber, the court stated that the "statute does not prescribe the standard of review for legal conclusions of the Arbitrator but the parties, including the *amicus curiae* Pension Benefit Guarantee Corporation ('PBGC'), and the district court agree that the legal conclusions of the Arbitrator must be reviewed de novo, and we concur."[11]  Huber, 916 F.2d at 89.

---

[10]In Crown Cork & Seal Co., Inc. v. Cent. States Se. and Sw. Areas Pension Fund, the court stated that cases involving mixed questions of fact and law "undoubtedly benefit from the special knowledge and expertise of a skilled labor and pension law arbitrator."  881 F.2d 11, 19 (3d Cir. 1989)(citing Grand Union Co. v. Food Employers Labor Relations Ass'n, 808 F.2d 66, 70 n.5 (D.C. Cir. 1987)).  The court further stated that "after all, even pure issues of statutory interpretation under sections 1381-99 are interpretations which we believe Congress envisioned would be made by the arbitrator in the first instance."  Id.

[11]The Huber court did state that there is "dictum in Pension Benefit Guarantee Corp. v. Yahn & McDonnell, 481 U.S. 735 (1987) that can be read to suggest that legal conclusions of an MPPAA arbitrator must also be given deference."  916 F.2d at 90, n.4.  The Court stated that:

> We note that § 1401(c) requires the district court to presume the arbitrator's findings of fact correct, and makes no mention of the scope of review of the arbitrator's legal determinations.  In light of this court's settled policy of extreme deference to an arbitrator's legal as well as factual determinations, see, e.g., United Steelworkers of America, District 36 v. Adbill Management Corp., 754 F.2d 138 (3d Cir. 1985), we do not read this omission as suggesting that the district court has plenary review over the arbitrator's findings of law.

Id.

## V. DISCUSSION

As already noted, the parties have both filed Motions for Summary Judgment and have filed extensive briefs in support of their Motions.[12] It has been a difficult task to discern from these extensive briefs exactly what issues the Fund is appealing from the Arbitration Decision. These are the issues that we have identified and will address: (1) the date of Nolt's withdrawal from the Fund; (2) the inclusion of forfeitable benefits in the calculation of vested benefits; (3) the Fund's recalculation of withdrawal liability based upon a retroactive increase in UVBLs; (4) the validity of pre-demand interest; and (5) the calculation of the payment schedule for withdrawal liability.

### 1. Date of Withdrawal from the Fund

As detailed above, for a number of years, Nolt was a member of the RCA, a multiemployer association that bargained for new CBAs with the Roofer Union. Nolt was a signatory to the 1997 to 2001 CBA. In July 2000, a new eight-year CBA was ratified by the Union membership and Nolt accepted the CBA. However, ninety days before the expiration of the 1997-2001 CBA, Nolt advised the RCA that it was withdrawing from the RCA. The Fund brought unfair labor practices against Nolt with the NLRB. An ALJ found no violation of the MPPAA by Nolt's behavior. A split Board panel reversed and the Third Circuit eventually reversed the Board finding that Nolt's withdrawal from the RCA was proper and that Nolt was not bound by the 2001-2009 CBA.

Also, as noted earlier, on May 1, 2006, the Fund issued a notification to Nolt that it

---

[12]The Fund's brief consists of 83 pages and Nolt's brief runs 62 pages. The briefs are also accompanied by 112 exhibits.

owed withdrawal liability based on Nolt making a complete withdrawal from the Roofers Local 30 Combined Pension Plan (the "Plan") during the 2001 Plan year. The Fund calculated the withdrawal liability to be $370,327 (Pls.' Mot. Summ. J., Ex. 49.) This, however, was not the Fund's first calculation of Nolt's liability. Rather, it was the Fund's second "revised" calculation because in 2002 the Fund had previously calculated the withdrawal liability to be $58,226. (Id., Ex. 76.) Thereafter, Nolt issued a timely "Request for Review" of the Fund's Withdrawal Liability Demand, and one month prior to arbitration, the Fund adopted a third position on Nolt's withdrawal liability. The former Plan actuary, and the Fund's expert at arbitration, James McKeough, F.S.A. ("McKeough") issued a March 18, 2008 expert report (the "McKeough Report") which set forth a third calculation of Nolt's withdrawal liability in the amount of $509,949. (Id., Ex. 53.) The Fund conceded at arbitration that the Withdrawal Liability Demand was erroneous because it did not apply the "presumptive method" of calculating withdrawal liability and that this error was corrected in the McKeough Report which had the result of decreasing Nolt's purported withdrawal liability.[13]

Subsequent to the arbitration, the Fund presented for the first time in its post-hearing brief, a fourth and fifth position on the amount of withdrawal liability owed by Nolt. The Fund's new theory claimed that Nolt should be found to have withdrawn from the Fund in 2005 and that Nolt owed either $706,816 or $831,248 in withdrawal liability.

The Arbitrator determined that there are both procedural and substantive reasons why Nolt must be deemed to have withdrawn in 2001 and why the allocation of UVBLs must take

---

[13]However, the McKeough Report also contained a previously unasserted assessment of $176,000 in "pre-demand" interest. (Id., Ex. 111 at 85-88.) This issue of "pre-demand" interest will be discussed, infra.

place as of December 31, 2000. The Arbitrator rejected the assertion of the Fund that the

withdrawal should have taken place in 2005. We agree and find that the presumption of

correctness of the Arbitrator's factual determinations with regard to this issue has not been

overcome by "a clear preponderance of the evidence." In addition, our de novo review of the

legal findings of the Arbitrator find no error.

In his decision, the Arbitrator determined that the Fund was estopped from changing

its position during the course of the arbitration that Nolt's withdrawal date should be 2005 and

not 2001, as it had asserted up to the arbitration. The Arbitrator noted that the Fund assessed

withdrawal liability based upon a 2001 withdrawal date both in its May 2006 Demand for

Withdrawal Liability, and thereafter, in its March 2008 recalculated demand. The Arbitrator

emphasized that all of the facts that the Fund relied upon in favor of a 2005 withdrawal date

existed and were known to the Trustees of the Fund in May 2006 when the original Demand

for Withdrawal Liability was issued. (Arbitration Decision at 12.) The Arbitrator further

based his decision on the fact that:

> The Court of Appeals had ruled, including the Amended Judgment, and
> a significant period of time had thereafter elapsed during which no
> contributions were made to the Fund. Additionally, the Fund took no
> action to withdraw the Demand that was based upon a 2001 withdrawal
> date, refund any interim payments received, and reassess the Employer
> with withdrawal liability based upon a 2005 withdrawal date. Instead,
> the Fund persisted in its efforts to collect the withdrawal liability that
> was grounded in the May 2006 Demand and the modifications of the
> March 2008 report (both of which were based upon an assertion of a
> 2001 complete withdrawal) and even argued as of March 2008 for
> predemand interest based upon a 2001 date of withdrawal.

(Id. at 12-13.)

Thus, the Arbitrator ruled that the date of Nolt's withdrawal was not a determination

appealable to him for resolution under the MPPAA because the Fund had determined that Nolt made a complete withdrawal in 2001 in its May 1, 2006 demand. Thus, the Arbitrator ruled that because Nolt did not challenge that determination in its Request for Review under 29 U.S.C. § 1399(b)(2) or in its appeal by means of statutory arbitration pursuant to 29 U.S.C. § 1401(a)(1), the Fund's determination of a 2001 withdrawal date had not been appealed and was not properly before the Arbitrator under the MPPAA.

We agree with the Arbitrator's findings of fact that the Fund's prior actions were inconsistent with its newly announced position of a 2005 withdrawal because the Fund had not rescinded its Demand based on a 2001 withdrawal. Moreover, the Fund did not refund Nolt's withdrawal liability payments based on a purported 2005 withdrawal date. We also agree that the Fund had been aware of all of the facts relied upon in arguing for a 2005 withdrawal date for more than three years since the Third Circuit decision, yet as late as the eve of the arbitration hearing, when the Fund changed its position and adopted the position in the March 18, 2008 McKeough Report, the Fund still utilized a 2001 withdrawal date.

As noted earlier, the MPPAA gives a plan statutory power to unilaterally determine by issuance of written notice that a complete withdrawal has occurred, when such had occurred, the amount of withdrawal liability and the schedule of payments. See 29 U.S.C. § 1399(b)(1). Such a determination binds an employer to commence payments, strictly according to the plan's determination, under the MPPAA. The "pay now, dispute later" principle of the MPPAA is well established. 29 U.S.C. § 1399(c)(2)[14] calls on the employer to pay

_____

[14]This section provides:

(2) Withdrawal liability shall be payable in accordance with the schedule

16

"notwithstanding" contentions that may prevail in the end. Thus, the MPPAA puts payment ahead of decision. See, e.g., Bd. of Trs. of Trucking Employees of N. Jersey Welfare Fund, Inc.- Pension Fund v. Centra, 983 F.2d 495, 507 (3d Cir. 1992); Trs. of the Chi. Truck Drivers Pension Fund v. Cent. Transport, Inc., 935 F.2d 114, 118 (7th Cir. 1991).

An employer has limited rights under the MPPAA to challenge a plan's statutory power. An employer may request the plan's review of any aspect of its withdrawal liability which the Fund may handle as it sees fit and it is only obligated to inform the employer of its decision and explain any change it may choose to make. See 29 U.S.C. § 1399(b)(2). In addition, an employer may appeal through arbitration any determination made by a plan under 29 U.S.C. §§ 1381 to 1399. See 29 U.S.C. § 1401(a)(1).

Here, the Fund determined that Nolt made a complete withdrawal in 2001 and owed withdrawal liability in the amount of $370,327. Nolt was legally obligated to make payments according to the payment schedule, and if it disagreed with the amount and/or any other decision the Fund had made in coming to its determinations, including the withdrawal date, its only avenue was to appeal through arbitration. Nolt did seek arbitration and challenged the amount of the withdrawal liability and payment schedule, however, it did not challenge the Fund's determination that it made a complete withdrawal in 2001. Thus, Nolt proceeded

---

set forth by the plan sponsor under subsection (b)(1) of this section beginning no later than 60 days after the date of the demand notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule.

29 U.S.C. § 1399(c)(2).

through the arbitration process, as it was required to do so under the MPPAA, to challenge

decisions made by the Fund and all decisions made by the Arbitrator at that time were made

with the assumption that there was no issue that Nolt had withdrawn from the Fund in 2001.

It is apparent that had the 2001 withdrawal date been an issue at that time, Nolt would have

had his opportunity to exercise his rights under the MPPAA before the Arbitrator. Thus, we

agree with the Arbitrator that this issue was not properly before him and that the Fund is now

procedurally barred from challenging its own determination that Nolt made a complete

withdrawal in 2001.[15]

The Arbitrator also determined that "even if the matter were properly subject to

redetermination based solely upon the assertion of Counsel, the record is clear that the

Employer withdrew in May 2001." (Arbitrator Decision at 13). We agree. Contributions

were last made when the 1997-2001 agreement expired and contributions thereafter were not

made due to an ongoing labor dispute. There is no record evidence that Nolt was ever

required to continue to contribute to the Fund after the expiration of the 1997-2001 CBA.

There was also never a claim made by the Fund that even if Nolt properly withdrew from the

RCA and was not bound by the 2001-2009 Agreement, "it still was required to make

contributions to the Fund as a result of the obligation under federal labor law to continue the

status quo until changed as a result of impasse following good faith bargaining." (Id.) In

addition, the Fund has provided no evidence of a successor CBA providing for the making of

---

[15]In addition, it is notable that the Fund has offered no support for its assertion that the
Arbitrator erred in determining that the Fund is procedurally barred from challenging the 2001
withdrawal date.

contributions to the Fund. Moreover, as pointed out by the Arbitrator:

> if the Fund had made a claim to receive contributions after May 2001, then one would have expected the Fund not to have assessed withdrawal liability at all, and instead to have pursued a collection action for unpaid contributions from May 2001 through the date when impasse would have been reached that provided explicitly for a cessation of contributions.

(Id. at 13-14.) Thus, we agree with the Arbitrator that the Fund's own actions substantiate a withdrawal date of 2001 and that the record contains no convincing evidence of a 2005 withdrawal date.

**2.  The Inclusion of Forfeitable Benefits in the Calculation of Vested Benefit Liabilities**

The next issue for review involves the Arbitrator's determination that the Fund improperly treated a number of benefits as "nonforfeitable," and therefore, improperly included them in the valuation of the Fund's UVBLs. We include the following background before specifically addressing this issue.

Nolt asserts that it bears no obligation under the MPPAA to pay withdrawal liability unless the Fund had ULBLs in the relevant plan years that Nolt participated in the Fund. Nolt states that the Fund's initial calculation in 2002 of Nolt's withdrawal liability of $58,226 was based upon the Fund's actuarial reports reflecting the existence of $2.7 million in UVBLs in 2000, the only relevant Fund year where there were UVBLs. Nolt asserts that there were no UVBLs in 2000 because the Plan actuary improperly included more than $8.5 million in benefits in the schedule of UVBLs, and as such, there was never any basis to assess any withdrawal liability under the MPPAA. (Def.'s Mot. Summ. J. at 22.)

The MPPAA provides that an employer is liable for its pro rata share of the

unamortized amount of the change in the plan's unfunded vested benefits during the relevant years of plan participation through the year prior to an employer's withdrawal.[16]  The MPPAA defines the value of a plan's "unfunded vested benefits" as an "amount equal to (A) the value of the nonforfeitable benefits under the plan, less (B) the value of the assets of the plan."  See 29 U.S.C. § 1393(c).

The calculation of a plan's UVBLs is based, in relevant part, upon the value of the plan's "nonforfeitable benefits."  See 29 U.S.C. § 1393(c).  The MPPAA defines a nonforfeitable benefit as:

> a benefit for which a participant has satisfied the conditions for entitlement under the plan or the requirements of this chapter (other than submission of a formal application, retirement, completion of a required waiting period, or death in the case of a benefit which returns all or a portion of a participant's accumulated mandatory employee contributions upon the participant's death), whether or not the benefit may subsequently be reduced or suspended by a plan amendment, an occurrence of any condition, or operation of this chapter or the Internal Revenue Code of 1986[]. . . .

29 U.S.C. § 1301(a)(8).

"Vested benefits" carried by a plan are not the same as its "nonforfeitable benefits."  In his decision, the Arbitrator cited PBGC Opinion Letter 91-2, explaining the difference between the two:

> "Nonforfeitable benefits" are not the same as "vested benefits." Benefits become "vested" when a plan participant has completed the required number of years of service under the plan, and "vesting" means simply that that the participate has the right to receive a

_____

[16]Under the presumptive method, an employer is liable for a proportional share of UVBLs for any year of participation in the plan where there were UVBLs.  See 29 U.S.C. § 1391(b)(2)(A).

retirement benefit even if he or she leaves the service of the employer before retirement age. A benefit, even though "vested," is not considered to be "nonforfeitable" until the participant has met all the plan's requirements for that particular benefit. ERISA section 4001(a)(8). Forfeitability is determined as of the plan's termination date.

(Arbitration Decision at 35.) Nolt asserts that "in sum, the existence and amount of a plan's UVBLs depends upon the value of its nonforfeitable benefits." (Def.'s Mot. Summ. J. at 23-24.) We now turn to the issue of whether the Fund properly included certain forfeitable benefits in the calculation of the UVBLs.

The Arbitrator determined that the Fund included $8.5 million in benefits that were "nonforfeitable" in its schedule of Plan year 2000 UVBLs.[17] We agree and find no error with the Arbitrator's factual findings concerning this issue, nor do we disagree with these findings upon a de novo review of the legal conclusions.

In his decision, the Arbitrator determined that the Fund was required to remove from the schedule of UVBLs for the Plan year 2000 the value of any early retirement benefits for those Plan participants where all of the conditions for entitlement had not been met. The Arbitrator reviewed nine types of benefits[18] provided by the Fund. The Arbitrator then

---

[17]The Fund's inclusion of $8.5 million in benefits in the schedule of UVBLs that were not forfeitable involved two classifications of benefits. The first was the inclusion of the value of three types of early retirement benefits for Plan participants where they had not satisfied the age and/or years of service conditions for entitlement. Specifically, these were for Special Early Retirement Benefits, Regular Early Retirement Benefits and Deferred Vested Benefits. The Fund actuary determined the total value of these to be $7 million. The second was the inclusion of the value of Death Benefits for Deferred Vested Participants, Post-Retirement Single Sum Death Benefits, Pre-Retirement Surviving Spouse Pension Benefits and Pre-Retirement Death Benefits. The Plan actuary determined the value of these death benefits to be about $1.53 million.

[18]The Arbitrator reviewed the Plan provisions for each of the following benefits: Normal Retirement Pension Benefits, Disability Retirement Pension Benefits, Special Early Retirement

determined that the value of three types of early retirement benefits should not be included in the schedule of UVBLs, but only in those instances where the conditions for entitlement under the plan for benefits had not been met.[19] The Arbitrator determined that where participants had satisfied the age and service conditions for entitlement to benefits as of December 31, 2000, they were nonforfeitable under the MPPAA. In addition, they were properly included in the calculation of UVBLs. Further, where participants had not satisfied either the age or service requirements as of December 31, 2000, these benefits were not forfeitable and should be removed from the schedule of UVBLs. (Arbitration Decision at 42-44.)

In coming to these determinations, the Arbitrator applied the plain language of the MPPAA which provides that a benefit is nonforfeitable only when a participant has "satisfied the conditions for entitlement under the plan." See 29 U.S.C. § 1301(a)(8). In support of its position, the Fund relies largely upon a decision out of the Northern District of California, United Foods, Inc. v. Western Conference of Teamsters Pension Trust Fund, 816 F. Supp. 602 (N.D. Cal. 1983), aff'd 41 F.3d 1338 (9th Cir. 1994). Nolt relies primarily upon a series of

---

Pension Benefits, Regular Early Retirement Benefits, Deferred Vested Benefits, Death Benefits for Deferred Vested Participants, Post-Retirement Single Sum Death Benefits, Pre-Retirement Surviving Spouse Pension Benefits and Pre-Retirement Death Benefits. (Arbitration Decision at 42-47.)

[19]The three benefits were the Special Early Retirement Pension Benefits, Regular Early Retirement Benefits and Deferred Vested Benefits. (Arbitration Decision at 42-44.) With respect to the Special Early Retirement Pension Benefits, the Arbitrator found that participants became eligible for this benefit upon the completion of twenty years of service and reaching age 50. With regard to the Regular Early Retirement Benefits, the Arbitrator found that the participants became eligible upon completion of five years of continuous service and age fifty. Lastly, concerning the Deferred Vested Benefits, the Arbitrator determined that participants became eligible upon reaching age fifty. (Id.)

Pension Benefit Guarantee Corporation ("PBGC")[20] Opinion Letters and the Third Circuit

decision, Huber, 916 F.2d at 85.  It must be noted that "Opinion Letters" from the PBGC are

entitled to "considerable weight."  The Supreme Court, in Chevron, U.S.A., Inc. v. Natural

Resources Defense Council, stated that "[w]e have long recognized that considerable weight

should be accorded to an executive department's construction of a statutory scheme it is

entrusted to administer, and the principle of deference to administrative interpretations."  467

U.S. 837, 844 (1984); see also Huber, 916 F.2d at 96-97.

In Huber, the Third Circuit upheld the arbitrator's determination that a lump sum

benefit was not nonforfeitable under the MPPAA because death was a condition to

entitlement, and had not been met in the facts of that case.  The court specifically overturned

the district court's reversal of the arbitrator on the basis that death was not a condition for

entitlement to such benefits.  916 F.2d at 85.  The Third Circuit held that its position was

consistent with the position taken by the PBGC since 1975, as specifically codified by

Congress in 1980 when it enacted the MPPAA.  Id. at 104.  With respect to the mention of

"death" in 29 U.S.C. § 1301(a)(8), the court stated:

> The PBGC notes that "[i]f Congress had intended all death benefits to
> be non-forfeitable, it could easily have drafted the language of [§
> 1301(a)(8)] to accomplish that purpose."  The Fund fails to explain why
> Congress chose to qualify "death" if all death benefits were to be
> considered vested. . . . By referring to "death" in a list of exceptions to

<hr>

[20]Enacted in 1974, ERISA created the PBGC, a wholly-owned government corporation, to
administer and enforce a pension plan termination insurance program, to which contributors to
both single-member and multiemployer plans were required to pay insurance premiums.  See 29
U.S.C. § 1302(a); see also Concrete Pipe, 508 U.S. at 607-08; Pension Benefit Guar. Corp. v.
LTV Corp., 496 U.S. 633, 636-37 (1990) (describing the organization and functions of the
PBGC).

> "conditions or requirements" of the plan that must be satisfied, Congress clearly contemplates that death can be a "condition or requirement" for entitlement to a death benefit. By limiting this exception to the case of a certain type of benefits, Congress implicitly denies the exception to the case of other types of benefits. Since the lump-sum death benefit in this case had nothing to do with the return of mandatory employee contributions, the exception has no application to this case.

Id. at 104-05.

The court in United Foods came to the opposite conclusion of Huber. There, the court found that survivor/death benefits were nonforfeitable, not withstanding the facts that the participant had not died as of the valuation date. The court reasoned that "the employee's death is [not] a condition for entitlement to death benefits because the participant does not have to die to be entitled to the type of death benefits in this case . . . death is simply the time at which vested benefits are paid out to the beneficiaries of plan participants." 816 F. Supp. at 608. The Arbitrator carefully considered the United Foods decision when he set forth his reasoning for rejecting its holding:

> I am persuaded that, despite the equity and policy appeal of the holding of the United Foods Court, the views expressed by the PBGC and the Huber Court should be followed herein. They manifest greater fidelity to the language of the Act and are supported by decades of consistent interpretation of the Act by the expert agency entrusted with the primary responsibility for the implementation of Title IV of ERISA. The holding of the United Foods Court would render the limited exception to the entitlement language of Section 4001(a)(8) of "death in the case of a benefit which returns all or a portion of a participant's accumulated mandatory employee contributions upon the participant's death[]" mere surplussage. It redefines death as solely the date of timing of the benefit payout, rather than as a condition for entitlement which employs an exception only in a narrowly defined instance. The Court reached that holding without any evidence that this construction was intended or

desired by Congress. It presumes that decades of consistent
PBGC construction to the contrary must be ignored,
undermining the deference that is due to the formal Opinion
Letters published by the Corporation.

While the fact scenario in Huber was limited to a lump sum type of
benefit, its rationale is not so limited. Unless the situation involves a
death benefit that simply returns all or a portion of a participant's
accumulated mandatory employee contributions upon a participant's
death or unless that benefit was substantially derived from a reduction
in the pension benefit payable to the participant or surviving beneficiary
for which the participant has satisfied all conditions for entitlement
under the plan or requirements of this Act (other than submission of a
formal application, retirement, or completion of a required waiting
period), the death benefit must be deemed other than nonforfeitable and
the inclusion of a value for the benefit in the calculation of the
unfunded vested benefit liabilities of the Fund will violate the Act,
including, particularly, Section 4213(c), 29 U.S.C. § 1393(c) ("For
purposes of this part, the term 'unfunded vested benefits' means with
respect to a plan, an amount equal to – (A) the value of non-forfeitable
benefits under the plan, less (B) the value of the assets of the plan.").

(Arbitration Decision at 39-40.)

Likewise, in a de novo review of this issue, we come to the same legal conclusions as
the Arbitrator and find no need to reiterate the above sound reasoning of the Arbitrator. We,
too, find that the Third Circuit's decision in Huber supports a determination that the Fund
improperly treated the benefits at issue as "nonforfeitable" and, therefore, improperly included
them in the valuation of the Fund's UVBLs.

Moreover, arbitration testimony from the Fund's own actuary and expert at the
arbitration is perhaps most damaging to the Fund's position that the findings of the Arbitrator
were in error with regard to the instant issue. The Fund's actuary, McKeough, candidly
admitted the difficulty in this area in determining which types of benefits are "nonforfeitable,"
which ones are "vested" and which get included in withdrawal liability calculations.

25

McKeough testified at the arbitration hearing:

> Q: You indicated that based on the structure of your own firm,
> that there were others who handle the nuts and bolts, if I can call
> it that, programming issues, a lot of data issues and the like?
>
> A: Yes.
>
> Q: Sitting here today, are you confident that the numbers contained in your
> most recent report, in fact do not include nonforfeitable benefits, for example?
>
> A: The level of technical expertise that I have in my office has
> grown significantly since I started my business in 1999, 2000,
> when these mistakes were made.  Sitting here today, I have to
> admit a little confusion in my own mind about what's
> nonforfeitable, and what's vested and what's protected, and
> what gets in withdrawal liability calculations and what does not.

(Pls.' Mot. Summ. J., Ex. 111 at 236 (emphasis added).)  It is apparent that in light of such an

acknowledgment that it would be difficult for the Fund to make any kind of convincing

argument that the Arbitrator somehow erred in finding that the Fund included $8.5 million in

benefits that were "nonforfeitable" in its schedule of 2000 UVBLs.  Accordingly, in light of

our circuit's decision in Huber and McKeough's testimony, we find no error in the

Arbitrator's factual and legal conclusions.

**3.     The Fund's Recalculation of Withdrawal Liability Based Upon a Retroactive
Increase in UVBLs**

In the course of his preparation of the Plan's 2002 actuarial report during 2003, the

Plan actuary, McKeough, discovered a  "programing error" which he claimed had understated

the Plan's UVBLs by more than $10 million dollars.  (Pls.' Mot. Summ. J., Ex. 79.)

McKeough claimed that he discovered that when his firm took over actuarial services for the

Plan in 1999, his firm made mistakes in reading and interpreting data, and programing his

computers, relative to certain benefits linked to Social Security. He asserted that this led to an understatement of UVBLs. (Id.)

McKeough stated in a letter to the Fund dated October 3, 2003:

> The two calculations differ in item #4– Unfunded Vested Liability as of December 31, 2000. In preparing the 2002 variation we uncovered and corrected programming errors in prior variations. These errors resulted in an understatement of plan liabilities in the January 1, 2001 variation of $10.2 million. Since the programing errors were in the retiree valuation, this affected the December 31, 2000 UVB by the same amount. We have not re-issued the 2001 valuation report.

(Pls.' Mot. Summ. J., Ex. 79.) As a result, McKeough claimed that the UVBLs were understated by about $3.3 million for the 1999 Plan year and $7.0 million in the 2000 Plan year. (Id., Ex. 81.)

The Arbitrator determined that the Fund's attempt to retroactively increase the schedule of 1999 and 2000 UVBLs was not permitted under the MPPAA. The Arbitrator based his decision on the PBGC's interpretation of the MPPAA and the facts of this case.

The Arbitrator opined:

> There are several reasons why I am persuaded that the Fund was required to use the values for vested benefits liabilities that were produced by the computer program in use as of the date when the Actuarial Valuation for the Plan Year beginning January 1, 2001 was prepared and the values for vested benefits liabilities that were reported on the Form 5500, Schedule B, and was not permitted to increase the unfunded vested benefits liabilities allocated to the Employer based upon new data and information discovered years later and never made the subject of the original Actuarial Valuation or Schedule B.
>
> First, PBGC Opinion Letters No. 90-2 and 94-5, read together, prohibit an after the fact change to unfunded vested benefit liabilities that will increase the withdrawal liability of a

withdrawn employer. Second, there is no meaningful distinction between the computer software which misread the underlying data of the Fund as to the benefits properly payable to a number of participants, and the data correction of approximately $8 million which corrected for having valued significant benefits that were erroneously treated as vested benefits to deceased participants as still payable. To charge one to the Employer, but deprive the Employer of the benefit of the other, simply results in a deliberately skewed valuation of the Fund's unfunded vested benefit liabilities. Third, the record made clear that the claimed error was never deemed sufficiently material to amend the Form 5500, Schedule B or the Actuarial Valuation for the Plan Year beginning January 1, 2001. Nor were changes made to the Funding Standard Account for the 2001 Plan Year as a result of either error individually or the two collectively. Fourth, if the Demand were made closer to May 2001, it is doubtful that the Fund could have amended its Demand when the computer software error was discovered almost two years after the withdrawal of the Employer. No reason exists to treat the withdrawal liability of the Employer in this case differently simply because of the delay in the issuance of the Demand letter. The amount of the liability was fixed, on a "snap shot" basis, without regard to future events, as of December 31, 2000.

The Employer has failed to establish that the Fund was required to apply the changes in assumptions adopted effective January 1, 2002 retroactively to the Plan Year ending December 31, 2000 (or earlier). There is no legal basis for such retroactive changes in assumptions to be made. Moreover, the Experience Study included one full year after December 31, 2000. There was no record evidence to find that Mr. McKeough would have changed the assumptions effective in 2000 or earlier even if he had known the results of the pre-2001 actual experience.

For all these reasons, I find that the Fund improperly used an inflated unfunded vested benefit liability figure for the 2000 Plan Year (and perhaps the 1999 Plan Year as well) when calculating the Employer's withdrawal liability.

(Arbitration Decision at 28-29.)

The Fund argues that the Arbitrator's conclusions ignore the Supreme Court's holding

in Concrete Pipe "that IRS rules on minimum funding methods under 26 U.S.C. § 412 are expressly authorized as the default rules on withdrawal liability under 29 U.S.C. § 1393(b)(1)." (Pls.' Mot. Summ. J. at 56-57.) The Fund asserts that:

> McKeough explained that the standards for retroactive data corrections are not fixed but have certain IRS guidelines. The first is a general rule that errors exceeding the standard statistical variation of 5% are material and should be addressed differently than other errors. The reason for the $10 million correction in the 2002 valuation was a concern that his firm, as actuaries, had misinterpreted data and understated minimum funding requirements in a material fashion as a result."

(Id. at 52.)

However, Nolt argues that the Arbitrator did not ignore any ruling in Concrete Pipe which would have a legal effect upon the instant issue. Nolt asserts that Concrete Pipe makes no mention of this IRS provision as cited by the Fund anywhere in the Court's opinion, and specifically, does not address the issue of retroactively increasing UVBLs. (Def.'s Mot. Summ. J. at 40.) We agree. We find nothing in Concrete Pipe that supports a finding that the Arbitrator erred in finding that the Fund's attempt to retroactively increase the schedule of 1999 and 2000 UVBLs was not permitted under the MPPAA. Instead, we read Concrete Pipe as primarily addressing an employer's constitutional challenge to the MPPAA and not addressing the issue of retroactive increase to a schedule of UVBLs.[21] 508 U.S. at 605.

The Fund next claims that the Arbitrator erred in relying on PBGC Letters to support his decision and ignored inapposite IRS memoranda and directives. (Pls.' Mot. Summ. J. at 56-57.) The Fund specifically cites an IRS Technical Advice Memorandum ("TAM") in

---

[21]In fact, it is notable that the Fund fails to specifically elaborate in its Motion how Concrete Pipe supports its position on this issue.

support of its position that the Arbitrator erred in determining that the Fund's attempt to retroactively increase the schedule of 1999 and 2000 UVBLs was not permitted under the MPPAA.  However, the cited authority is unpersuasive.  The Fund asserts that TAM 8831003, WL 572309 (April 25, 1988) explains the different rules on retroactivity for changes of assumptions and corrections of mistaken facts.  This TAM determined that because a plan's deductable limit depends upon the methods, factors and assumptions to calculate plan costs, the Form 5500 could not be retroactively amended to change those methods, factors and assumptions except as permitted or required by the IRS Commissioner.  However, the IRS observed that a plan's Form 5500 could be amended to correct underlying errors.  Id.  This TAM reasoned that:

> If after a Schedule B has been signed and submitted it is discovered (whether on IRS audit or otherwise) that the underlying FACTS (e.g. census data, asset amounts, plan provisions, etc.) upon which the calculations had been made were incorrect, the Schedule B should be amended to show costs and liabilities based on facts which were correct.

(Id.)  However, it is apparent that this TAM has no relevance to this case.  As the Arbitrator recognized, the Plan never amended any Form 5500 to reflect the $10 million retroactive increase to the Fund's schedule of UVBLs.  (Arbitration Decision at 28-29).  The Arbitrator specifically stated that:

> The record made clear that the claimed error was never deemed sufficiently material to amend Form 5500, Schedule B or the Actuarial Valuation for the Plan Year beginning January 1, 2001.  Nor were changes made to the Funding Standard Account for the 2001 Plan Year as a result of either error individually or the two collectively.

(Id. at 29-30.)  In addition, the Fund has failed to explain in its Motion the significance of this

TAM because the Fund never made any changes to any Form 5500 to correct McKeough's programming error. Furthermore, the Fund has failed to include any case as support for the legal significance that a federal court is to accord a TAM.

On the other hand, PBGC Letters are to be given "considerable weight." As noted earlier, the Supreme Court in Chevron stated that "[w]e have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations." 467 U.S. at 844. Thus, the Arbitrator correctly gave considerable weight to PBGC's Opinion Letters 90-2 and 94-5 in supporting his legal conclusions.

In Opinion Letter 90-2, a plan reported that its actuary had reallocated, for the 1988 plan year, unfunded vested benefit liability for the 1980 through 1987 plan years based upon corrections to certain contribution and control group data. The plan inquired to the PBGC whether the unfunded vested benefit reallocation for those prior years could be applied to employers that had withdrawn or were currently paying or contesting withdrawal liability. The PBGC determined that no retroactive adjustments of UVBLs were permissible. (Pls.' Mot. Summ. J., Ex. 85.) PBGC Letter 90-2 states in relevant part:

> [W]e understand that for the 1988 plan year the plan's enrolled actuary has reallocated unfunded vested benefit liability from December 31, 1979 through December 31, 1987 on the basis of current information, some of which differs from that used in prior years by reasons of corrections to certain data, including contribution and controlled group data. You have asked whether this reallocation affects employers that have previously withdrawn, including those employers that have paid or are currently paying their withdrawal liability, and those who are still in the process of contesting their liability. . . .

If the trustees discover an error in the calculation of the plan's unfunded vested benefits for a prior plan year, the valuation for that prior year may not be changed retroactively. Any necessary correction of the plan's unfunded vested benefit liability should be reflected in the valuation that revealed the earlier error or, if the error was not discovered in connection with a valuation, in the first valuation following the discovery. Any employer that withdraws in the plan year to which the "corrected" valuation applies would be affected by the correction, by virtue of the operation of the statutory allocation methods.

(Id.)

In PBGC Opinion Letter 94-5, a plan asked for a clarification of "PBGC Opinion Letter 90-2 to the extent it addresses calculation of unfunded vested benefits for purposes of section 4211 of the Employee Retirement Income Security Act of 1974." (Id., Ex. 86.) The PBGC stated:

[In PBGC Letter 90-2], we wrote that the value of unfunded vested benefits cannot be modified retroactively if the plan's actuary later finds an error in its calculation. Any adjustment to the value of the unfunded vested benefits would have only a prospective impact. Therefore, if faulty assumptions resulted in an understatement of unfunded vested benefit, employers who were underassessed withdrawal liability as a result would not generally be subject to an additional assessment.

(Id.)

The PBGC then stated:

You asked us to reevaluate that issue with respect to a mathematical or computational error that results in a withdrawal liability overpayment. You assert that a computer program used to generate an actuarial valuation was flawed so that the valuation did not correctly reflect the plan's actuarial assumptions. The trustees of the plan do not wish to change any of the assumptions or data used for purposes of determining withdrawal liability. They wish only to run the same assumptions or data through corrected software. The corrected

calculations will result primarily in reduced assessments, and
the trustees do not intend to increase assessments even for the
few employers whose withdrawal liability was understated
because of the computer error.  In particular, you have asked
whether the trustees may refund a withdrawal liability
overpayment resulting from such an error where the employer
did not, or can no longer, request review and/or arbitration of
the original assessment.

(Id.)

PBGC responded to the inquiry and clarified that Opinion Letter 90-2 was

distinguishable because it precluded any retroactive increases to withdrawal liability and not

the permissibility of refunds.  It stated:

In Opinion Letter 90-2, we were referring to errors relating to
mistaken or varying data or actuarial assumptions, rather than
errors that are purely mathematical or computational in nature.
Moreover, we assumed that the Trustees were considering
additional assessments for underpayments, rather than refunds
for over payments, based on these errors.[22]

(Id.)

Thus, the Arbitrator's legal conclusions are supported by these Opinion Letters which

he correctly gave "considerable weight."  Chevron, 467 U.S. at 844.  Likewise, we give the

Opinion Letters "considerable weight."  Because our research also has found no convincing

support for the Fund's position, we find that the Fund's attempt to retroactively increase the

schedule of 1999 and 2000 UVBLs was improper.

---

[22]The PBGC then held that:  1) a plan sponsor was not required to refund a withdrawal
liability overpayment, but 2) such a course of action was not precluded by Title IV of ERISA so
long as the refund did not violate the exclusive benefit rule or the restrictions on repayments
contained in Title I of ERISA and the Internal Revenue Code.  (Id.)

**4. Pre-Demand Interest**

At the Arbitration, for the first time, the Fund sought almost $175,000 in "pre-demand" interest for the period December 31, 2001 to July 1, 2007. The Fund sought this interest on the basis of the McKeough Report. The Arbitrator rejected this claim and the Fund challenges that decision here.

The Arbitrator's decision explains the background of this issue:

> The Fund's May 2006 Demand did not seek predemand interest-i.e., interest prior to the date on which the first payment was due, but after the end of the "gap year" (i.e., the year in which withdrawal occurred). The revised March 18, 2008 calculation of Mr. McKeough, however, included a significant charge ($175,988) for interest from the period December 31, 2001 (one year after the end of the plan year in which the Employer withdrew) forward to July 1, 2007 at the rate of 8% per annum that was absent from his initial calculations (which formed the basis of the Demand in this case).
>
> The issues presented with predemand interest are primarily legal in nature- i.e., whether pursuant to Section 4219 of the Act, the Fund was required to assess interest for the period from the first day of the year following the year of withdrawal through the date on which the first payment was due (i.e., sixty days after the date of the Demand) or whether no interest may be assessed for that period.

(Arbitration Decision at 54.) This claim, however, has no legal basis and is rejected.

In Huber, the Third Circuit addressed the issues of a fund's claim for both gap year interest[23] and pre-demand interest. Initially, the parties in Huber went to arbitration and the arbitrator ruled that the fund's claims for both gap year interest and pre-demand interest were improper under the MPPAA. The district court reversed. On appeal, the Third Circuit

---

[23]Gap year interest is interest from the end of the plan year preceding withdrawal to the end of the plan year in which withdrawal occurred.

concluded that gap year interest was properly payable, but held that pre-demand interest was improperly demanded.  Huber, 916 F.2d at 96-100.

In support of its position that pre-demand interest is proper in this action, the Fund has cited a number of cases which it argues distinguishes Huber.  We, however, disagree and find that none of the cases cited overturn and/or distinguish Huber's holding that the MPPAA does not provide for pre-demand interest.  We will address several of these cases below.

The Fund first asserts that:

> If the withdrawal is deemed to occur in 2001, the Plan disagrees. Huber is distinguishable in the context of the mandated delay in assessment during a labor dispute.  Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co., 513 U.S. 414 (1995), otherwise overruled the direct holding in Huber and emphasized the amortization commands of ERISA that must be interpreted to provided interest in the context of a retroactive calculation date to achieve the statute's goals.

(Pls.' Mot. Summ. J. at 75.)

The Arbitrator noted in his opinion that the Fund relies upon language in Milwaukee Brewery that "discussed interest as part of the payment schedule and further discusses interest becoming payable after the first day of the plan year after the employer withdraws." (Arbitration Decision at 57.)  The Arbitrator concluded that the reliance upon that language to support a claim for pre-demand interest is misplaced because Milwaukee Brewery only addressed "gap year" interest and the demand in that case was made within the year of withdrawal.  The Arbitrator noted that no claim for pre-demand interest was made in that case. (Id.)  We agree.  Milwaukee Brewery clearly only addressed a claim for "gap year" interest. There, the fund's demand for withdrawal liability took place prior to the end of the plan year

in which the withdrawal actually took place, and thus, there was no claim by the fund for any pre-demand interest beyond the gap year and the issue of pre-demand interest was not presented to the Court for determination.  The Court went on to conclude that gap interest could not be assessed under the MPPAA.  <u>Milwaukee Brewery</u>, 513 U.S. at 421-31.  Thus, <u>Milwaukee Brewery</u> overruled <u>Huber</u> only with respect to this issue.

Likewise, the other cases cited by the Fund to support its contention that pre-demand interest is allowable under MPPAA are misplaced.  For example, the Fund cites <u>Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Frebar Corporation of California, Inc.</u>.  The Court addressed the MPPAA's statute of limitations in connection with an action to collect withdrawal liability payments from the employer.  522 U.S. 192 (1997).  The Fund asserts that this case reconfirmed the point that "[i]nterest accrues from the day of the plan year following withdrawal."  522 U.S. at 197.  This quote, however, is misleading because a reading of this case indicates that the Court was only citing to <u>Milwaukee Brewing</u> in arriving at the proposition that "first year" interest is prohibited and referring to calculation of the payment schedule under 29 U.S.C. § 1399(c)(1)(A)(I).  There is nothing in <u>Bay Area Laundry</u> that suggests that the MPPAA allows pre-demand interest.

The Fund also cites to <u>Pension Benefit Guaranty Corporation v. Furlong Manufacturing Company</u>, 590 F. Supp. 740 (E.D. Pa. 1984), and <u>Pension Benefit Guaranty Corporation v. Quimet Corporation</u>, 711 F.2d 1085 (1st Cir. 1983) in support of its position.  However, the Fund has failed to assert any satisfactory explanation of how these decisions have any bearing upon "pre-demand" interest in connection with withdrawal liability and our

reading of these decisions does not reveal one.[24]  Thus, we follow the Third Circuit precedent

of <u>Huber</u> which specifically determined that the MPPAA does not allow for pre-demand

interest and find no error in the Arbitrator's decision.[25]

　　　An appropriate Order follows.[26]

---

[24]We also agree with the Arbitrator that the Fund's actions indicate that it understood that pre-demand interest is not permissible under the MPPAA and Third Circuit law.  The Arbitrator stated:

> The fact that Mr. McKeough did not assess predemand interest in the initial May 2006 Demand and that the Trustees upheld that judgment also suggests that the Fund Actuary and the Trustees both understood that claims for predemand interest are neither customary nor permissible under the Act.  If predemand interest was allowable at the time of the May 2006 Demand, one would have expected Mr. McKeough to have included it in his calculation and the Trustees to have included that claim as part of the May 2006 Demand.

(Arbitration Decision at 59.)

[25]The last issue in the Fund's appeal involves the calculation of the payment schedule for withdrawal liability.  In the McKeough Report, the Fund advocated a payment schedule calculated according to a different methodology than in the Withdrawal Liability Demand.  The Arbitrator rejected the Fund's changed methodology as being inconsistent with the MPPAA. This issue, however, is now moot because we have affirmed the Arbitrator's decision, and determined that Nolt owes no amount of withdrawal liability for which a payment schedule need be calculated.

[26]We also deny Nolt's request for attorneys fees and costs in connection with this action.

37